UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JAMES ADAM BURNS,                          )
                                           )
          Plaintiff,                       )
                                           )
     vs.                                   )     Case No. 1:16-CV-230 (CEJ)
                                           )
NANCY A. BERRYHILL,[1] Acting              )
Commissioner of Social Security,           )
                                           )
          Defendant.                       )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On January 23, 2014, plaintiff James Adam Burns filed applications for a period of disability, disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of October 31, 2013.[2] (Tr. 217-23, 224-29). After plaintiff's applications were denied on initial consideration (Tr. 160, 161), he requested a hearing from an Administrative Law Judge (ALJ). Following a video hearing on April 20, 2015, (Tr. 66-110), the ALJ issued a decision denying plaintiff's applications on May 15, 2015. (Tr. 14-59). The Appeals Council denied plaintiff's request for review

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

[2] Plaintiff sought disability benefits on two prior occasions. (Tr. 17-18). On July 27, 2009, he filed applications for alleged disabilities beginning on May 15, 2008. After initial denial, plaintiff sought a hearing from an ALJ but then requested dismissal. He filed for benefits again on March 1, 2012, with an alleged onset date of June 15, 2011. An ALJ denied the 2012 applications on October 20, 2013. (Tr. 118-30). Plaintiff did not appeal the denial. (Tr. 17). The ALJ considered evidence from the prior applications in reaching his decision. However, the prior exhibits they are not included in the administrative record before the Court.

on August 5, 2016. (Tr. 1-7). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. <u>Evidence Before the ALJ</u>

### A. <u>Disability Application Documents</u>

In a Disability Report dated January 23, 2014, plaintiff reported that he was unable to work due to a malformed spine, bipolar disorder, manic depressive disorder, borderline schizophrenia with psychotic tendencies, social avoidant personality disorder, major anger issues with intermittent aggression, chronic pain in back and left hip, sleep apnea, night terrors, tingling and numbness in legs, right leg is shorter than left leg, and headaches — head trauma. (Tr. 243-44). He worked as a general laborer and trash collector and had been self-employed in the construction and scrap industries. Plaintiff's prescriptions included a muscle relaxer and an opioid to treat back pain, medication to treat migraines, a sleep aid, an antidepressant, and an anxiolytic. (Tr. 246). On July 17, 2014, and March 11, 2015, plaintiff reported that he was taking medications for bipolar disorder, anxiety, high cholesterol, and pain. (Tr. 290, 296).

In a Function Report completed on February 2, 2014, plaintiff reported that he lived with and helped care for his father, who had Parkinson's disease. (Tr. 254-64). Plaintiff and his father shared responsibility for laundry, cooking, and housework, as well as caring for a pet. Plaintiff prepared meals and did yard work when able. He spent time networking on Facebook and playing games. He also worked as a "prayer warrior" and youth counselor. (Tr. 261). He stated that pain interfered with his ability to fall asleep and complete personal hygiene. His hobbies included tattooing, body piercing, and shooting pool, which he engaged in as often

as possible, although his hands did not work as well as they used to. He went out at least once a day, but not alone, because he had social avoidant disorder and did not deal well with others. He did not have a driver's license. Plaintiff was able to pay bills, count change, and manage bank accounts. He had difficulty following written and spoken instructions, completing tasks, and handling changes in routine. When he became too stressed, he blacked out, repeated words, and behaved strangely. He had been fired from a job for constantly arguing with fellow employees. He had problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, using his hands, and getting along with others. He did not walk if he could avoid it. In an updated report completed on March 18, 2014, plaintiff stated that his back and hip pain had worsened and he had been diagnosed with bipolar disorder (borderline) and schizophrenia (borderline) with psychotic features. (Tr. 267-73).

## B. March 4, 2014 Disability Determination

Based on a review of the medical records, State disability evaluator Geri Spears found that plaintiff had the medically determinable impairment of degenerative disc disorder. (Tr. 136-47; 148-59). She opined that plaintiff could frequently lift or carry up to 10 pounds and occasionally lift or carry up to 20 pounds; could sit, stand, and walk for a total of 6 hours in an 8-hour work day, with normal breaks; could frequently climb ramps, stairs, ladders, ropes, and scaffolds; and could occasionally stoop, kneel, crouch, or crawl. Psychologist James W. Morgan, Ph.D., found that plaintiff's medically determinable impairments were affective disorder, anxiety-related disorder, and substance addiction disorder.

Medical records showed that plaintiff demonstrated very good concentration and attention but had poor insight and judgment. He reported adequate energy and mood. Dr. Morgan opined that plaintiff was moderately limited in the abilities to understand, remember, and carry out detailed instructions; make simple work-related decisions; maintain concentration and persistence for extended periods; perform activities within a schedule, maintain attendance, and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms and work at a consistent pace without unreasonable breaks; interact appropriately with the public and coworkers; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Plaintiff's allegations of disabling mental conditions were partially credible, in that he had "some limitations but his concentration and mood are good [and] he is able to function to do many activities." (Tr. 140). Dr. Morgan concluded that plaintiff was not disabled on the basis of his mental impairments.

### C. Testimony at the April 20, 2015 Hearing

Plaintiff was 42 years old at the time of the hearing. (Tr. 74). He lived in a mobile home with his girlfriend and his father. He had a daughter who was a college student in Wisconsin and with whom he was in regular communication. He had completed high school and was able to read, write, and do simple math. (Tr. 75). He had no vocational training. Plaintiff was chiefly supported by his father and girlfriend and he received food stamps. (Tr. 76). He and his girlfriend also collected scrap metal about twice a month. (Tr. 77). Plaintiff's driver's license had been revoked five years earlier; he would be eligible to have it reinstated in another year. (Tr. 75).

Plaintiff previously worked as a trailer finisher, installing floor boards and axles. At the same time, he worked part-time as a trash collector. In 2007, he sustained a work-related back injury. (Tr. 77-79). Between 2009 and 2012, he did construction work for his brother-in-law. He testified that his "back was really bad then" and that he could not lift more than 20 pounds. (Tr. 80-81). At the time of the hearing, plaintiff was able to sit and stand between 10 and 20 minutes before he needed to change positions, and walk for about 20 minutes before he needed to rest. (Tr. 94).

Plaintiff testified that he suffered from constant back pain, arising from a congenital spine malformation and subsequent injury. (Tr. 83). He said that when cooking meals he stood for five minutes at a time with intervals of rest. It took him four days to complete yard work, after which he spent two days in bed. (Tr. 84). Following his back injury in 2007, he had 6 months of chiropractic treatment. More recently, he received injections which reduced the pain enough to allow him to be more active. In addition, he had just been prescribed hydrocodone by a pain management center. The medication "takes the edge off" the pain but he still experienced stabbing, burning and pinching sensations, especially in his left hip. (Tr. 84-85). He also had pain in his knees, which he attributed to injuries he sustained in a car accident when he was a teenager. He underwent arthroscopic procedures at the time of the original injury. (Tr. 85-86). Finally, he experienced loss of sensation and motor control in his hands due to pinched nerves, causing him to drop things on a daily basis. (Tr. 87).

Plaintiff testified that he had mental health issues that interfered with his ability to work. He began cutting himself when he was five years old in response to

familial stress. He testified that he did not get along well with others and had issues with anger and aggression when he worked with others. (Tr. 87-88). He regularly experienced auditory and visual hallucinations. In the past, he had been treated with various medications, including lithium and Thorazine, without much benefit. He was presently receiving treatment from a psychiatrist and three different counselors. His medications reduced the duration of his hallucinations and had stabilized his mood somewhat. (Tr. 90-91).

Plaintiff had a history of alcohol and marijuana abuse. (Tr. 92). He testified that he began using substances to cope and "to feel normal." His current psychotropic medications eliminated the need to abuse alcohol and marijuana. It had been over a month since he last used alcohol and more than three months since he used marijuana. He had used cocaine in the past, citing a host of triggers, including finding his mother's dead body and the stillbirth of a child. (Tr. 93). He denied ever abusing prescription medications, although he had recently tested positive for Xanax and been discontinued from his pain management care. (Tr. 94, 42). He asserted that the test was incorrect and reported that he had become quite upset. (Tr. 97) (testifying, "it was not a pretty sight."). He testified that he underwent regular drug screens as a condition of probation, which he was scheduled to finish within a year.

Vocational expert Roxane Minkus, Ph.D., testified that plaintiff's previous employment as a trailer assembler was performed at the medium level of exertion and had a specific vocational preparation (SVP) of 3; his previous employment as a construction worker was performed at the light level and had an SVP of 4. (Tr. 99). The ALJ asked Dr. Minkus about the employment opportunities for an individual of

plaintiff's age, education, and work history who was limited to light exertional level work; who was limited to occasional climbing stairs and ramps, stooping, kneeling, crouching and crawling; could have only occasional interaction with the public and coworkers; and was limited to work that required only occasional decision making and changes in work setting. Dr. Minkus testified that such an individual would not be able to perform plaintiff's past relevant work but could perform nationally-available work as a housekeeper, bench assembler, and electrical equipment sub-assembler. (Tr. 101). These three jobs would still be suitable for an individual who could have no interaction with the public. If the hypothetical individual were restricted to sedentary work, he could perform work as a small-product or bench assembler, a surveillance systems monitor, or product sorter. (Tr. 103-04). Each of these positions would accommodate the need to change positions once an hour. An individual who was off-task 20 percent of the day, due to pain or mental health issues, would be unable to maintain employment without special accommodation. (Tr. 105-06). Similarly, there would be no work available in the competitive labor market for an individual who became aggressive in the workplace. (Tr. 107).

## D.  Medical Records

Between October 31, 2013, the alleged onset date, and May 15, 2015, when the ALJ issued the decision in this case, plaintiff regularly saw his primary care physician, Daniel G. Domjan, M.D. He also received pain management services, chiefly from the Saint Francis Medical Center. He received psychiatric and counseling services from Bootheel Counseling Services.

### 1.  Primary Care

Plaintiff saw Dr. Domjan ten times between March 2013 and November 2014. His initial visit occurred shortly after his release from a six-month term of imprisonment for a parole violation. (Tr. 510-17). He complained of pain in the lower spine which he attributed to a congenital spine malformation, a motor vehicle accident in 1988, and years of manual labor. He also experienced numbness and tingling in his left foot. In addition, plaintiff suffered from migraine headaches, which were well-controlled with medication. Plaintiff reported that he was presently using marijuana and had a history of using cocaine and hallucinogens. He had not used alcohol for six months. Plaintiff reported that he did a lot of walking. Dr. Domjan described plaintiff as alert and in no acute distress and his mood was euthymic; he denied suicidal ideation. On examination, plaintiff had multiple arthralgias of the shoulders, wrists, hands, and knees, with mild tenderness of the lumbosacral spine on palpation; straight-leg raising test was positive on both sides. Plaintiff was able to touch his ankles. He displayed normal reflexes, stance, gait, and sensation. Dr. Domjan assessed plaintiff's conditions as inadequately controlled lumbago, well-controlled migraine headaches, alcohol abuse in remission, and depression with anxiety. Dr. Domjan advised plaintiff to stop smoking and start a swimming program to treat his back pain.

Over the course of the next eight office visits, plaintiff's weight trended higher, albeit with some fluctuation, and he stopped exercising. He continued to demonstrate tenderness of the lumbosacral spine on palpation and, starting in May 2014, displayed a limp. (Tr. 501, 499, 497). He began consuming modest amounts of beer. (Tr. 507, 505, 503). Starting in October 2013, Dr. Domjan prescribed tramadol for pain, (Tr. 508, 502, 500), and by December 2013, plaintiff was being

treated for GERD. (Tr. 505, 503). In December 2013 and January 2014, plaintiff reported blackouts and dizziness. Id. At the last visit in February 2015, Dr. Domjan noted that plaintiff was limping on the right side, but he did not have any sensory abnormalities or motor dysfunction. In Dr. Domjan's assessment, plaintiff's GERD was well-controlled, his obesity was stable, his migraine was improving, his depression with anxiety was stable, and his alcohol abuse was in remission. (Tr. 495). His lumbago remained unchanged and he suffered from chronic pain.

## 2. Pain Management

Plaintiff received treatment for lumbar pain from Carmen Keith, M.D., at the Saint Francis Medical Center between August 2013 and March 2015, when he was discharged for failing a drug screen. Plaintiff presented with complaints of lumbago that radiated up into his head and down both legs, with numbness and weakness in both legs. An MRI completed on August 6, 2013, confirmed plaintiff's report that he had a congenital malformation of the lower spine, showing that the L5 vertebra was partially sacralized. (Tr. 341). In addition, plaintiff had a severe loss of disc height at L4-L5 with disc desiccation and discogenic endplate irregularity and endplate changes. Plaintiff also had moderate disc extrusion causing stenosis at multiple levels, ranging from mild to marked, with a herniated disc at L4-L5 extending along the course of the L5 nerve root.

On October 22, 2014, plaintiff told Dr. Keith that he had pain in his lower cervical spine and lower lumbar spine, his left leg, and knees. He rated the pain at level 7 on a 10-point scale. (Tr. 420). He also reported dizziness, headaches, and numbness in his left leg and hand. On examination, plaintiff was alert and oriented, with appropriate affect and demeanor. He had normal deep tendon reflexes and

intact sensory responses. His gait was affected by a left leg limp and the use of a cane. He had decreased range of motion and back pain with flexion and extension, and straight leg raising was positive on the left. He also had tenderness in the lumbar spine and facet pain with extension. Muscle testing revealed at least 10 pounds of tone and strength at the L2 through L4 levels. (Tr. 422). The assessment was lumbar radiculopathy with progressively worsening left leg pain and lumbar axial pain which Dr. Keith proposed to treat with a lumbar epidural steroid injection. When plaintiff returned on October 29, 2014, he rated his pain at level 7, and reported that the pain had begun radiating into his hips. (Tr. 406). A lumbar steroid injection was administered. (Tr. 408).

Plaintiff was seen at Cape Spine and Neurosurgery on November 21, 2014.[3] (Tr. 455-58). He reported that he had low back pain which he rated at level 7. He denied feeling weak or dizzy. He stated that he used a cane when walking farther than 50 feet. On examination, plaintiff performed heel- and toe-walking with difficulty. Straight leg raising was positive on the right, while thigh-thrust and Patrick's tests were negative. Plaintiff had full ranges of motion, normal reflexes, and intact sensation. (Tr. 457). Plaintiff was assessed with herniated lumbar disc, degeneration of the lumbar disc (worsening), and spinal stenosis in the lumbar region, without neurogenic claudication. Plaintiff reported that the October 2014 injection provided 80 percent pain relief and resolved his bilateral radiculopathy and pain radiation; he was scheduled for a second injection in January 2015. Plaintiff was encouraged to continue treatment with Dr. Keith because the injections dramatically improved his pain. Further, "[i]f he no longer receives pain relief, he is

---

[3] This visit is described as a three-month follow-up after pain management. (Tr. 455). The record does not include notes from any prior visits with this provider.

to call our office and we will order a new MRI . . . [and] discuss surgical intervention." (Tr. 458). There is no record that plaintiff re-contacted Cape Spine and Neurosurgery for another MRI or further treatment.

On December 12, 2014, Dr. Keith noted that Dr. Domjan had asked her to take responsibility for prescribing plaintiff's pain medications. Plaintiff's left leg pain had resolved but his medication provided only minimal relief for his back pain. (Tr. 446). On examination, plaintiff had a left leg limp and tender points in the lumbar region. However, he had intact sensation and scored four on a five-point scale on tests of muscle strength and tone. (Tr. 448). Plaintiff received another lumbar injection that day. At follow-up on December 29, 2014, plaintiff reported complete improvement in his left leg pain, but not his back pain, which he rated at level 5. (Tr. 438, 436). He also reported suicidal thoughts a week earlier. On examination, he had a left leg limp and tender points in the lumbar region; sensation was intact. Dr. Keith prescribed a new muscle relaxer, ordered a urinalysis, and referred plaintiff for a psychological evaluation.

Mark H. Kinder, Ph.D., completed a psychological evaluation on January 7, 2015. (Tr. 479-84). Dr. Kinder noted that plaintiff's chronic leg and back pain was complicated by his psychiatric history of a thought disorder and substance abuse. Plaintiff acknowledged having suicidal thoughts in the recent past, but he identified appropriate deterrents to suicide and presented a low risk for suicide. Plaintiff participated in a dual diagnosis treatment program through which he saw a psychiatrist, a counselor, and two caseworkers who came to his home. Plaintiff claimed to have abstained from alcohol use for six months and marijuana use for four months. He denied that pain caused deficits in his self-care and he was able to

complete household chores, including laundry, cleaning, and cooking. His leisure activities included watching television, spending time on the computer, and doing piercings and tattoos. He hoped to avoid spine surgery. (Tr. 481).

Dr. Kinder administered a personality assessment inventory. During the assessment, plaintiff was alert and fully oriented. He had grossly intact attentional capacity and appropriate cognitive processing rate. He had fluent speech patterns, with logical and sequential productions and no evidence of thought blocking or dysnomia. He exhibited abstract reasoning, problem-solving and judgment processes. He displayed good cognitive endurance and showed no significant impulsivity during testing and his frustration tolerance was intact. With respect to plaintiff's scores on the inventory, Dr. Kinder noted that he had elevated scores across multiple scales and that there were indications that he was not completely forthright in his responses. Nonetheless, his profile suggested that he was self-centered and preoccupied by somatic complaints to the exclusion of concern for others. (Tr. 483). His responses also suggested a history of antisocial behavior and a likelihood of impulsive and reckless behavior. He endorsed responses indicating that he experienced unusual sensory or perceptual events, including hallucinations, with occasional confusion and difficulty concentrating. Dr. Kinder opined that plaintiff might have difficulty establishing close relationships and might have episodes of poorly controlled anger and other affects. Plaintiff's responses on another instrument indicated that he was at high risk for opioid misuse. (Tr. 479). Dr. Kinder's diagnostic impressions were psychotic disorder, not otherwise specified; pain disorder associated with psychological factors and medical condition;

and chronic pain syndrome. Dr. Kinder also provided rule out diagnoses of PTSD, major depressive disorder, bipolar disorder, and antisocial personality disorder.

Plaintiff returned to Dr. Keith's office on February 9, 2015. (Tr. 468-72). He rated his pain at level 4. He complained of pain in his feet and his right knee and had a limp. He continued to have tenderness in the lumbar spine. Sensation was intact. He was sent for a urine test and given a follow-up appointment for March 9, 2015. (Tr. 471). When plaintiff appeared as scheduled, see Tr. 462-63 (signed permission-to-discuss form dated March 9, 2015), he was informed that he was being discharged from the Saint Francis program because he failed a drug screen. (Tr. 549). Later that day, he had an intake for pain management services at Managed Care, Inc. (Tr. 547-50). It was observed that plaintiff was not in acute distress, had a normal gait, and had no difficulty with sitting in a chair or getting up from a seated position. After he signed a controlled substance agreement, he was given refills for his pain medications. The record contains no further treatment notes from this provider.

### 3. Mental Health

On May 14, 2013, plaintiff appeared at the Gibson Recovery Center for an assessment, based on the recommendation of his probation officer. (Tr. 309-17). Plaintiff reported that he had been incarcerated for a total of 99 months for drug offenses and parole violation. He had three charges of driving while intoxicated. He was diagnosed with alcohol abuse, cannabis dependence, generalized anxiety disorder and cyclothymic disorder and was determined to be appropriate for substance abuse treatment. There are no further treatment records from the Gibson Recovery Center.

Pavan Palepu, M.D., of Bootheel Counseling Services, completed a psychiatric diagnostic evaluation on September 24, 2013. (Tr. 328-31). Dr. Palepu noted that plaintiff had a history of mood instability, psychosis, anxiety, and significant drug dependence. As a child, he moved frequently and suffered verbal and physical abuse from both parents. He cited his mother's death nine years earlier as a big source of stress. In addition, he had no income and owed $8,000 in court costs. He was hoping his application for disability would be approved. He reported that his mood, ability to concentrate, and energy levels were not problematic, and that it had been a year since he experienced suicidal ideation. He had some thoughts about harming others who had "done him wrong in the past" but denied having a plan. Plaintiff reported that he constantly heard two or three voices whispering and murmuring but he had learned to deal with them. He had visual hallucinations about once a week. He experienced flashbacks and nightmares on a nightly basis. He had experienced periods of mania, with racing thoughts, pressured speech, and reckless behavior, such as getting tattoos and piercings. He also experienced anxiety, which interfered with his sleep and concentration. He had panic attacks about once or twice a month. He denied having symptoms of obsessive compulsive disorder. Plaintiff reported that he had six prior suicide attempts many years earlier. He had never been hospitalized for psychiatric care. Finally, plaintiff had a 20 year history of marijuana and cocaine use and had previously used methamphetamine for about 5 years. At the time of the evaluation, he used alcohol and marijuana about once a week and had used narcotics a week earlier. On mental status examination, Dr. Palepu noted that plaintiff was casually dressed and had numerous tattoos and piercings. He was "very pleasant, cooperative and attentive"

with good eye contact and no psychomotor disturbances. (Tr. 330). His speech was normal, his thought processes were logical and coherent, his memory was intact, and he appeared to be of average intelligence, with "very good" attention and concentration. Dr. Palepu assessed plaintiff's insight as fair and his judgment as poor. He was not responding to internal stimuli and there was no evidence of dissociation or agnosia. Dr. Palepu diagnosed plaintiff with schizoaffective disorder, bipolar type (rule out substance induced mood disorder and substance induced psychotic disorder); alcohol dependence; opiate dependence; cannabis dependence, moderate; and cocaine and methamphetamines dependence in sustained full remission. Dr. Palepu prescribed an antipsychotic, anti-anxiety and antidepressant medications. In addition, he referred plaintiff to Bootheel's co-occurring disorders program and community psychiatric rehabilitation program.[4] (Tr. 331).

Plaintiff saw Dr. Palepu once a month until April 2014.[5] (Tr. 326, 348, 346, 320, 396, 394, 392). During this time, plaintiff continued to report hallucinations and he presented with an irritable and/or depressed mood. Nonetheless, plaintiff was appropriately groomed, he made good eye contact, and he had normal fluency. Over the course of treatment, Dr. Palepu made adjustments to plaintiff's medications, including adding medications for bipolar disorder. Between October 2013 and March 2014, Dr. Palepu assigned plaintiff a Global Assessment of

---

[4] As noted by Dr. Kinder, Bootheel Counseling Services provided plaintiff with medication management, case management and counseling services. The only treatment notes included in the record relate to the monthly medication meetings with psychiatrists Palepu and Kohler.

[5] Dr. Palepu memorialized the office visits with a form progress note which provided check boxes for various categories of a patient's presentation, including appearance, speech, mood, hallucinations, etc. Other sections require the physician to writes notes. These narrative sections are nearly illegible.

Functioning (GAF) score between 52 and 54.[6] In April 2014, plaintiff presented with pressured speech and was disheveled. Dr. Palepu changed plaintiff's diagnoses to mood disorder, not otherwise specified, and psychosis, not otherwise specified and assigned plaintiff a GAF score of 47.[7] (Tr. 392).

In June 2014, responsibility for plaintiff's medication management transferred to Linda Kohler, M.D., also of Bootheel Counseling Services. (Tr. 390). At that time, plaintiff reported that he was tired and had no energy or interests. His medications "took care of" the hallucinations and curbed his obsessive compulsive disorder and his anger. Dr. Kohler noted that plaintiff had "copious" facial piercings and tattoos. He made good eye contact, his speech was rapid, his mood was depressed, and his affect was incongruent. Dr. Kohler diagnosed plaintiff with schizoaffective disorder, moderate. Between July and October 2014, Dr. Kohler made multiple changes to plaintiff's medications in response to his reports of side effects. On July 11, 2014, plaintiff complained of daytime sedation and lethargy. (Tr. 388). On July 30, 2014, he reported that he was "terrible; just terrible." (Tr. 386). He complained of excessive jaw movement, inability to stay awake past 7:00 p.m., waking up frequently throughout the night, and increased anxiety. He had stopped taking his bipolar medication three days earlier. Plaintiff presented with fair and congruent affect, his speech and psychomotor activity were normal, and he

---

[6] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairments in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000) (DSM-IV). A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.
[7] A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." Id.

made good eye contact. In September 2014, plaintiff again reported that he was doing "terrible" and complained of "stress, anger, anxiety." (Tr. 384). He described his mood as agitated; his affect was incongruent. Dr. Kohler again changed plaintiff's medications and directed him to continue in counseling and case management. In October 2014, plaintiff reported that his medication caused agitation. However, he was sleeping well. (Tr. 382). Despite complaints of agitation and restless leg syndrome, his psychomotor activity during the session was unremarkable, he made good eye contact, and his thought content was goal directed. He was not experiencing hallucinations. His mood was euthymic and his affect was congruent. Dr. Kohler assigned a GAF score of 60,[8] and modified plaintiff's medications.

On October 13, 2014, Bootheel Counseling Service completed an annual psychosocial assessment (Tr. 356-371) and treatment plan (Tr. 372-75). Plaintiff reported that his "manic depression" was "pretty bad lately," and that he had low energy and poor sleep. (Tr. 369). He wanted to continue receiving services in order to maintain his abstinence from substance use, work on anxiety and depression, and maintain his support group. He opined that he had a tendency to allow his depression to get the best of him. He stated that he was living with his significant other and was satisfied with this situation. He was able to care for himself and there were "not any noted concerns . . . regarding symptoms of threat to personal health or safety." (Tr. 359). Plaintiff stated that physical pain, social anxiety and finances limited his ability to engage in recreational and community activities.

---

[8] A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

However, his relationships with family members were good and he frequently communicated with his daughter. His concentration was "fairly good" and his depression was "medium." (Tr. 364). He still had auditory and visual hallucinations, flight of ideas, racing thoughts, and unspecified "unusual" thought, but he denied suicidal or homicidal ideation. He was described as "making progress with managing his mental health skills," "working through family issues in therapy," participating in services, and utilizing his coping skills. On mental status examination, plaintiff was noted to have a normal mood with congruent affect, intact memory, normal speech, and friendly, cooperative behavior. He successfully recalled three items after five minutes and completed serial sevens. (Tr. 365-66). He denied any current substance use. (Tr. 366). He was taking his medications as prescribed. (Tr. 367). His diagnoses were schizoaffective disorder, moderate; anxiety disorder, moderate; PTSD, moderate; and opioid dependence, moderate. He was assessed as having moderate, enduring problems related to the social environment, the legal/crime system, the economic realm, the occupational realm, and unspecified "other" psychosocial/environmental problems. He received a DLA[9] score of 45. Plaintiff's treatment goals included keeping his anxiety and anger below a level 5 on a 10-point scale for five days a week. (Tr. 373). Dr. Kohler signed off on the psychosocial assessment. (Tr. 371).

---

[9] "The Daily Living Activities (DLA) Functional Assessment is a functional assessment . . . designed to assess what daily living areas are impacted by mental illness or disability." Willa S. Presmanes, Beyond Global Assessment of Functioning: Ensuring Valid Scores and Consistent Utilization for Healthcare Report Cards, https://www.thenationalcouncil.org/wp-content/uploads/2012/11/DLA-Sample.pdf (visited June 13, 2017). As of April 1, 2014, in order to be admitted to community psychiatric rehabilitation programs in Missouri, adults must have a qualifying diagnosis and a DLA score of 40 or below. Missouri Division of Behavioral Health, Bulletin No. FY 14-Clinical 28, Using the DLA-20 to Establish Eligibility for Community Psychiatric Rehabilitation Programs, § 3.1.1.2 https://dmh.mo.gov/docs/ada/dla20eligibilityforcprclinicalbulletin28.pdf (visited June 13, 2017).

In November 2014, plaintiff told Dr. Kohler that "all [his] meds" were "working well." (Tr. 381). He had receive his first epidural steroid injection and his back pain was reduced. He rated his mood at 7 to 8 on a 10-point scale. His thought processes were goal-directed and he was not having hallucinations. His mood was euthymic, with congruent affect. Dr. Kohler assigned a GAF score of 70.[10] In January 2015, plaintiff reported that his back pain was largely helped by injections. He rated his mood at level 7, and said that his energy level was good and his sleep was "not bad." (Tr. 379). His thought processes were goal-directed and he was not having hallucinations. Once again, his mood was euthymic and his affect was congruent. Dr. Kohler assigned a GAF score of 75.[11] His presentation was largely unchanged in February 2015 and Dr. Kohler again assigned a GAF score of 75. (Tr. 377).

On March 24, 2015, Dr. Kohler completed a "Mental Impairment Questionnaire." (Tr. 487-93). She listed plaintiff's diagnosis as schizoaffective disorder and assigned a GAF score of 70. When asked to identify plaintiff's signs and symptoms, Dr. Kohler checked a total of 24 symptoms, including difficulty thinking, disturbance of affect, pathological aggressivity, hallucinations, manic syndrome, emotional lability, and recurrent severe panic attacks. She also assessed the extent of his limitations with respect to 21 work-related mental abilities and aptitudes, opining that plaintiff was "seriously limited, but not precluded;" "unable to meet competitive standards;" or had "no useful ability to function" for all but one

---

[10] A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

[11] A GAF of 71-80 corresponds with "transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV at 34.

of the categories. In support of these limitations, Dr. Kohler cited plaintiff's multiple tattoos and facial piercings. She also opined that plaintiff had marked difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and had had three episodes of decompensation within a 12-month period, each lasting at least two weeks. She opined that he would miss work four days a month.

### III.  The ALJ's Decision

In the decision issued on May 15, 2015, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements of the Social Security Act through March 31, 2016.

2.  Plaintiff did not engage in substantial gainful activity from his alleged onset date of October 31, 2013.

3.  Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine, obesity, schizoaffective disorder with bipolar features, anxiety disorder not otherwise specified, PTSD, pain disorder, and polysubstance dependence.

4.  Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except he is unable to climb ladders, ropes or scaffolds; is limited to occasional climbing of stairs and ramps; is limited to occasional stooping, kneeling, crouching and crawling; must avoid hazards; is limited to occasional interaction with the public and co-workers; and requires a low stress job, defined as work that involves only occasional decision-making and only occasional changes in the work setting.

6.  Plaintiff is unable to perform any past relevant work.

7.  Plaintiff was 40 years old on the alleged disability onset date and 42 years old at the time of the decision, and thus is a younger individual.

8.  Plaintiff has a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework

supports a finding that plaintiff is not disabled, whether or not he has transferable job skills.

10.     Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability within the meaning of the Social Security Act from October 31, 2013, through the date of the decision.

(Tr. 20-55).

## IV.     **Legal Standards**

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The

Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. § 404.1520; <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. <u>Id.</u>

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." <u>Moore</u>, 572 F.3d at 523 (<u>citing</u> 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." <u>Moore</u>, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and

frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within

the national economy. <u>Banks v. Massanari</u>, 258 F.3d 820, 824 (8th Cir. 2001). <u>See also</u> 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. <u>Discussion</u>

Plaintiff asserts that the ALJ improperly determined that he had the residual functional capacity to perform light work and improperly discounted Dr. Kohler's assessment of his limitations.

### A. <u>Residual Functional Capacity</u>

"The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." <u>Id.</u> (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001) (<u>quoting</u> <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." <u>Id.</u> Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. <u>Cox v. Astrue</u>, 495 F.3d 614, 619 (8th Cir. 2007) (<u>citing</u> 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

Here, the ALJ determined that plaintiff had the RFC to perform light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "requires a good deal of walking or standing," or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b); § 416.967(b). In reaching this

determination, the ALJ acknowledged that plaintiff had degenerative disc disease and routinely displayed tenderness to the lumbar spine on palpation, reduced range of motion, and an antalgic gait. However, plaintiff routinely displayed normal sensation, motor function, balance, and reflexes and had nearly full muscle strength and tone. Furthermore, no provider ever noted that plaintiff appeared to be in distress. At his last physical examination in March 2015, plaintiff had a normal gait and was able to sit and rise from seated without difficulty. In addition, plaintiff reported that his pain was significantly reduced by epidural steroid injections and medication.

The ALJ also determined that plaintiff's daily activities were consistent with the capacity to perform light work. Plaintiff took care of his disabled father and completed household chores and yard work. He played pool, went fishing, collected scrap metal, and did tattooing and piercing. Although plaintiff stated in his Function Report that he used a cane "all the time," (Tr. 260), he subsequently told a medical provider he only used the cane when walking distances of 50 feet or more (Tr. 458). The ALJ concluded that plaintiff's "extensive and diverse activities of daily living" demonstrated that he was able to ambulate effectively without a cane. (Tr. 52).

Plaintiff relies on an earlier ALJ decision which found that plaintiff had the RFC to perform sedentary, rather than light, work. However, an ALJ is not bound by the findings of a prior administrative determination which was based on a claimant's disability status at an earlier time. Charmichael v. Astrue, 1:09cv123 DDN, 2011 WL 285808, at *8 (E.D. Mo. Jan. 24. 2011) (citing Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001)). Plaintiff's argument that, as a general matter,

degenerative disc disease worsens over time does not demonstrate that, in his case, his condition actually deteriorated during the period under consideration, especially as the medical evidence supports a finding that his symptoms improved with medication and injections.

The ALJ's RFC determination is supported by substantial evidence in the record as a whole.

## B.  Treating Psychiatrist's Opinion

The ALJ gave limited weight to Dr. Kohler's March 2015 assessment of plaintiff's mental capacity to perform work-related functions, noting that the limitations she found were inconsistent with her own treatment notes and those of other providers.

The opinion of a treating physician is generally afforded "controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Chesser v. Berryhill, --- F.3d ----, 2017 WL 2485213, at *2 (8th Cir. June 9, 2017) (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) Where an ALJ assigns less than controlling weight to the opinion of a treating source, the ALJ must give good reasons for doing so. Id. (citing Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (quotations omitted). Good reasons for assigning lesser weight to the opinion of a treating source exist where "the treating physician's opinions are themselves inconsistent," or where "other medical assessments are supported by better or more thorough medical evidence." Id. (citations and internal quotations omitted).

The ALJ concluded that Dr. Kohler's extreme limitations in March 2015 were inconsistent with her documented findings during the eight prior mental status examinations and those of Dr. Palepu before her. Progress notes reflect that plaintiff consistently presented with good grooming, maintained good eye contact, generally had normal speech patterns, displayed intact cognition and goal-directed thought processes, and did not display unusual psychomotor activity. Furthermore, as treatment progressed, Dr. Kohler assigned higher GAF scores, reflecting her assessment that plaintiff's functioning had improved. Dr. Kohler's March 2015 assessment was also inconsistent with Dr. Kinder's assessment in January 2015, in which plaintiff presented as calm and cooperative, with intact frustration tolerance, good cognitive endurance, fluent, logical and sequential speech, and grossly intact attentional capacity. (Tr. 482-83).

Plaintiff argues that Dr. Kohler's opinion is bolstered by the assessment of non-examining reviewer Dr. Morgan, who found that plaintiff had moderate limitations in the activities of daily living. However, the other limitations assessed by Dr. Morgan were much less severe than those of Dr. Kohler and did not preclude the capacity to work. Thus, Dr. Morgan's report does not support Dr. Kohler's assessment.

Dr. Kohler's finding that plaintiff was emotionally withdrawn is inconsistent with his daily and social activities. By his own report, plaintiff cared for his father, interacted with his daughter, lived with his girlfriend, networked with others through Facebook, and provided tattoos and body piercing. Similarly, Dr. Kohler's assessment that plaintiff displayed pathological aggressiveness is unsupported by any observation or report that he engaged in confrontational or disruptive behavior

or came to the attention of law enforcement. Finally, there is no evidence in the record to support Dr. Kohler's statement that plaintiff had three episodes of decompensation lasting two weeks or more. During the period under review, plaintiff did not seek emergency treatment for a psychiatric crisis and was not hospitalized and there is no indication that plaintiff had a history of inpatient psychiatric treatment; indeed, he denied such a history. (Tr. 364).

The Court cannot say that the ALJ erred in determining that Dr. Kohler's opinion was inconsistent with her own treatment notes and other substantial evidence in the record.

## VI. **Conclusion**

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of June, 2017.